UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

IN RE:

ALAN DEATLEY LITIGATION

NO. CV-06-0278-JLQ

**MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT ON DEATLEY'S COUNTERCLAIM FOR LEGAL MALPRACTICE**

BEFORE THE COURT are Holland and Knight and Chris Howard's ["Plaintiffs" or "H&K"] Motion for Summary Judgment on Defendant's Counterclaim of Legal Malpractice on Grounds of Standing and Estoppel (Ct. Rec. 243); and Defendant and Counterclaimant, Alan DeAtley's ["Alan"], Motion to Strike (Ct. Rec. 387).   On April 4, 2008, the court stayed the hearing on summary judgment pending the exchange of evidence and supplementation of the record.  Ct. Rec. 395 [April 7, 2008 Order].  On June 17, 2008, the court heard argument on the motions, at which the court orally granted the summary judgment motion.  The following written order is intended to memorialize and supplement the oral rulings of the court.

I.    **INTRODUCTION**

In the mid-1970's, Alan left college to work for his father in his paving business, Superior Asphalt, induced by his father's oral promise to convey a 50% ownership

interest in the business.  Over the course of the following decades, Alan and his father repeatedly discussed Alan's asserted "vested interest, [his] stock, [his] ownership" in Superior.  Draft documents were prepared embodying their oral agreement regarding the asset.  Based on their course of conduct over many years, Alan believed he had acquired an interest in Superior and continued working for Superior "as if [he] was an owner" until 1994.  In 1992, Alan filed for bankruptcy and did not disclose to the trustee any interest in Superior or potential claim against his father, although bankruptcy law requires disclosure of all "legal and equitable interests," including unmatured, unliquidated, or contingent claims.  His bankruptcy discharge was finalized in April 1993.  According to Alan, in 1994, he was finally able to get his father to sign a document memorializing their "longstanding agreements" with a deadline for the transfer of his partial ownership in Superior.  In 2004, Alan filed suit against his father for breach of contract based upon his claimed right to ownership in Superior. The suit ultimately settled.

In present case before the court, Alan asserts a legal malpractice counterclaim against one of the law firms who represented him in the 2004 litigation against his father. Alan can not prevail on his malpractice claim if he is unable to demonstrate that he would have achieved a better result had his attorney performed competently.  Where, despite competent representation, Alan's claims against his father would have been barred as a matter of law by virtue of his failure to comply with the bankruptcy disclosure requirements, the malpractice claim necessarily fails.  Where there are insufficient facts to suggest Alan's breach of contract action was potentially viable, summary judgment is appropriate.

## II.    FACTS

### A. Litigation Background

Defendant Alan DeAtley ("Alan") is a businessman who in July 2004 engaged the law firm of Holland and Knight to represent him in litigation ("the Underlying Litigation") against his father, Albert DeAtley ("Albert"), concerning "the ownership of a

very successful, family owned, paving business," Superior Asphalt Company (and its affiliates) (collectively referred to as "Superior").  *DeAtley v. DeAtley*, Cause No. 04-CV-3082-JLQ, Ct. Rec. 2; Ct. Rec. 176 at ¶ 11, ¶18.  Plaintiff Christopher Howard is an attorney who worked at Holland and Knight and represented Alan in the action against his father.  Over the course of the Underlying Litigation, a succession of other law firms represented Alan including the law firm who initiated the action, Hale Friesen; the firm who appeared after Holland and Knight withdrew in November 2005, Paine Hamblen LLP; and the former Plaintiff in this action, attorney Richard Price.  The present motion only pertains to Holland and Knight and Howard, who are hereinafter jointly referred to as "H&K".

The Underlying Litigation was filed on July 22, 2004, in this court asserting Alan's right to recover monies from his father based upon a claim of breach of contract which stemmed from alleged promises dating back to 1974. *DeAtley v. DeAtley*, EDWA Cause No. 04-CV-3082-JLQ.  The father, Albert, moved for summary judgment on at least four separate grounds, including judicial estoppel.  *Id.* at Ct. Rec. 174-175. Oral argument was held on March 20, 2006 and the court reserved ruling while the parties pursued mediation.  In May 2006, Holland and Knight filed a Notice of Claim of Attorney Lien in the Underlying Litigation for approximately $300,000 in attorney fees allegedly unpaid by Alan prior to his termination of their services.  In July 2006, prior to a ruling from this court on the issue of judicial estoppel, Alan entered into a settlement agreement with his father with Alan receiving a $5.6 million settlement.  *Id.*  at Ct. Rec. 250.  Part of the settlement agreement required funds to be placed in a trust account for satisfaction of Holland and Knight's attorney lien.  Because the settlement agreement did not contain terms regarding the retention of jurisdiction by this court over the fee dispute, the court on September 11, 2006 held that it lacked jurisdiction to rule on the fee dispute in the context of the Underlying Litigation.  *DeAtley v. DeAtley*, EDWA Cause No. 04-CV-3082-JLQ, Ct. Rec. 296.

Shortly after the court ruled it lacked jurisdiction to consider the attorney fee

issue, Richard Price and Holland and Knight initiated the present lawsuit seeking recovery of unpaid attorneys' fees.  The court need not outline the intervening delays in the litigation, however, nearly one year and over 170 pleadings later, Alan answered Holland and Knight's complaint (See Ct. Rec. 117) and asserted a counterclaim (Ct. Rec. 176) against Holland and Knight and Howard for legal malpractice alleged to have occurred in the Underlying Litigation.

The legal malpractice counterclaim contends that the acts of malpractice in the action against the father essentially compromised the prosecution of the case leaving Alan no choice but to take a $5.6 million settlement, having less favorable terms than that which he would have recovered if he has been able to pursue the litigation and prevail.  Ct. Rec. 176 at ¶ 90.  His alleged damages include the loss of the value of his interest in the Superior companies.  The malpractice alleged to have occurred involved the failure of counsel to diligently prepare his case by allegedly failing to retain accounting and handwriting/authentication experts, failing to oversee associates working on the case, failing to disclose they were closing their office, failing to adequately conduct discovery, neglecting to file motions, losing original documents, and trying to cover up their actions.

This matter is now before the court on H&K's Motion for Summary Judgment seeking dismissal of the counterclaim.  H&K argues Alan can not prove the causation element of his malpractice case which demands proof that he would have been successful in the Underlying Litigation in which the alleged malpractice occurred.  H&K argues that Alan's claims against his father would have been dismissed on grounds of either judicial estoppel or standing because Alan failed to disclose and schedule his claimed interest in Superior and cause of action against his father in his bankruptcy.  Lacking evidence to prove he has damages  proximately caused by the alleged negligent acts of the attorneys, H&K argue they are entitled to judgment as a matter of law.  Alan opposes the motion arguing H&K has not met its summary judgment burden. Alan argues his action against his father would not have been precluded by standing or judicial estoppel

because 1) he did not possess a claim which would be property at the commencement of the bankruptcy, and 2) even if he did, his failure to disclose them was not a "knowing" mistake, but rather one based upon mistake or inadvertence.

**B. Underlying Facts**

On March 13, 1992, Alan and his wife filed for Chapter 7 Bankruptcy relief in New Mexico, *In re DeAtley*, Cause No. 92-11178 MA (Bankr. N.M 1992)("In re DeAtley). On April 15, 1992, Alan filed bankruptcy schedules, a Statement of Financial Affairs, and a Statement of Intention. In his bankruptcy schedules, Alan claimed that he had only $26,506 in assets and $1.4 million in debts, was not a party to any executory contracts, and had a total monthly income of $4680.00. In his Statement of Affairs, Alan was required to identify "stock and interests in incorporated and unincorporated businesses," "[i]nterests in partnerships or joint ventures," and "[o]ther contingent and unliquidated claims of every nature." Ct. Rec. 262, Ex. 3 at 30. Alan listed AD3 Corporation as the only business in which he had an interest. Alan signed the Statement of Affairs, which warned that falsification of information called for criminal sanctions. Neither Alan's schedules nor his Statement of Affairs mention nor disclose any right to, any claim against his father or interest in, Superior.

On May 27, 1992, Alan amended his Bankruptcy Statement of Affairs, but did not disclose any right to, or interest in, Superior or a potential claim against his father. In a second amendment on June 22, 1992, he also did not disclose any interest in Superior or a potential claim against his father. On July 20, 1992, the New Mexico Bankruptcy Court issued its Order discharging Alan and his wife from all dischargeable debts. This included an $83,000.00 debt owed to Superior and $83,640.00 owed to his father, Albert. On January 26, 1993, Alan petitioned the Bankruptcy Court to reopen the case so that he could schedule, and thereafter have discharged, a contingent obligation connected with a lawsuit in which he had been a named party defendant. The court granted the petition. His new filing did not mention or disclose any right to, or interest in the Superior Group Companies on a claim against his father. On April 5, 1993, the Bankruptcy Court issued

another order discharging the debts, including the newly disclosed contingent liability.

Although Alan did not schedule any interest or potential interest in Superior or a claim against his father in his Bankruptcy, it is undisputed herein that prior to his bankruptcy filings Alan believed that he had a right to half ownership in Superior (Ct. Rec. 246, Ex. 14 [8/9/06 DeAtley Depo.] at 106) and he believed his interest in Superior was "vested" (Ct. Rec. 246, Ex. 15 at 114). Alan stated in his deposition that he performed the work for Superior as he was asked to do "as if I was an owner." Ct. Rec. 246 , Ex. 15 [8/10/05 DeAtley Depo.] at 114. He also explained by affidavit that he did not list ownership of the Superior company because "I did not have a single share to my name in Superior or any of its subsidiaries." 04-CV-3082, Ct. Rec. 195 [DeAtley Affidavit] at ¶ 9.

Alan's wife shared his pre-bankruptcy view that he held a right to ownership in Superior. In 1991, Alan's wife filed for divorce. In the dissolution proceeding, in an affidavit, she testified that the financial information showed a "very complex, intertwined relationship between the businesses that my husband and I own, Superior Asphalt Company *which is owned jointly by my husband and me and his parents*, and the businesses that are purportedly owned only by his parents. When we acquired our interest in Superior Asphalt *in 1988 or 1989* my husband began receiving a salary of $150,000 per year..." Ct. Rec. 246 [Plaintiff's Stmt of Facts], Ex. 1 at ¶ 4 (emphasis added). Alan later agreed with his wife's statement that he *believed* he had acquired an interest in Superior Asphalt by 1988 or 1989, explaining that his parents had told he and his wife that, but that they just needed to formalize it "with documentation." Ct. Rec. 246, Ex. 16 at 140 [11/10/05 DeAtley Depo].

In Alan's wife's affidavit she also testified that Alan had threatened to put them through bankruptcy and that she believed her husband was "attempting to conceal or reduce the value of our assets, dispose of them or otherwise transfer title of them into third party names." Id. at ¶ 3. She went on to say, "It is clear to me that my husband's actions and those of my father-in-law have been contrived to confuse and hide our true

financial circumstances" (Id. at ¶ 8) and "He has been selling the assets and has been disguising assets to make them difficult to locate" (Id. at ¶ 3). This is why she believed that it appeared that they "*no longer seem* to have any ownership in Superior Asphalt." Id. at ¶ 7 (emphasis added).  In his March 25, 2008 deposition in the present case, Alan denied these allegations were true.  Ct. Rec. 473, Ex. B at 12.

The DeAtleys retained attorney Jennie Behles in New Mexico to represent them in their bankruptcy.  During her representation, she was told by Alan that he had been promised an interest in Superior.  04-CV-3082, Ct. Rec. 196 [Decl. of Behles] ¶4, ¶ 5. According to her affidavit filed in the Underlying Litigation, Behles called Alan's father to inquire about the interest Alan had described.  Behles states she was told by Albert that Alan had no interest in Superior. 04-CV-3082, Ct. Rec. 196 [Decl. of Behles] ¶4, ¶ 5. Behles then advised the DeAtleys that "no interest existed so as to require disclosure" in the bankruptcy.  04-CV-3082, Ct. Rec. 196 [Decl. of Behles] ¶5.  The bankruptcy petition and schedules were then filed with no mention of Superior.

In the Underlying Litigation against his father commenced in 2004, Alan asserted his right to an ownership interest in Superior and in his Amended Complaint outlined Alan's contribution to Superior and lengthy course of conduct with his father and the businesses dating back to the 1970s. *DeAtley v. DeAtley*, Cause No. 04-CV-3082-JLQ. Relevantly, Alan alleged therein that:

- In 1974, Albert made his first oral promise to convey an ownership interest to Alan in Superior Asphalt and Concrete Co., to which Albert's wife consented.  Ct. Rec. 2, ¶¶ 23-24.
- In 1975, Albert had orally agreed he would convey to Alan a 50% ownership interest in Superior Asphalt & Concrete Co if Alan would leave college and work full time for Superior, an agreement to which Albert's wife consented.  Id. at ¶¶ 27-28.
- From 1975 on through the years, Albert repeated his promise of interests in the Superior group of companies in exchange for Alan's services he

ORDER - 7

provided on behalf of the companies. Id. at ¶¶ 32, 36, 41, 45, 58.

- Throughout the 1980s, Alan made numerous requests to reduce he and his father's agreement to writing and circulated numerous draft documents. Id. at ¶ 51.

- In the summer of 1990, a typed "Understanding of Agreement" which called for the immediate process of transferring 50% of the Superior Asphalt ownership interest was prepared.  This document was signed by Alan DeAtley, Alan's mother and Alan's wife, but not by his father Albert. Additional drafts were produced, but not signed.

- Between 1990 and 1994, Superior experienced severe financial difficulties. Id. ¶ 57.

- "To remedy these financial difficulties, in May of 1991, Albert requested that Alan oversee and evaluate the operations of Blaze and that he spend a year training a replacement manager for Blaze.  In order to induce Alan to undertake this responsibility, Albert orally agreed that: (I) he would finally document and consummate his agreement to convey the Superior Interest to Alan; (ii) upon completion of the Blaze assignment, Alan would return to Superior as second-in-charge reporting directly to Sims; and (iii) upon the retirement of Sims (which Albert represented to be imminent) orally agreed in exchange for Alan agreement , Alan would be made President of Superior and its subsidiaries." Id. at ¶ 58.

It is undisputed that Alan in fact worked at Blaze starting in April 1991 until March 1993, at which time he returned to Superior.  Alan left working for Superior in August of 1994.

While Alan's Amended Complaint in the Underlying Action outlined over two decades of pre-bankruptcy conduct pertaining to his claims, he also therein alleged that after having labored over drafts of an agreement and "after numerous demands from Alan",  in the fall of 1994, Albert finally executed a written document (the "Guaranty

Agreement") "memorializing Albert and Alan's *longstanding agreements* including the *oral commitments* made by Albert in the *May of 1991* regarding Alan's service at Blaze, the succession plan of Superior and the transfer of the Superior Interest." Ct. Rec. 246, Ex. 13 at ¶ 61 (emphasis added). Alan testified that the Guaranty Agreement was a document utilizing draft agreements produced by and for Alan in years past with the assistance of lawyers. It allegedly provided that Albert would transfer ownership shares in Superior by December 2000 and set forth a $1 million per year penalty for failure to transfer the interest by the deadline.

Alan's Amended Complaint against his father delineated four separate claims including breach of contract, constructive trust, tortious interference with a business expectancy (which Alan had agreed to dismiss), and a request for declaratory and injunctive relief based upon the alleged breach of contract. The breach of contract claim incorporated the decades of factual background set forth in the Amended Complaint and alleged that Albert had breached the Guaranty Agreement.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the answers to interrogatories, depositions, admissions, and pleadings combined with the affidavits in support show that no genuine issue as to any material fact remains and the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted).

The moving party bears the initial responsibility of informing the court of the basis

for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The non-moving party must do more than show that there is some abstract doubt as to the material facts. It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment.

## IV.    ANALYSIS

### A. Legal Malpractice Elements

Alan claims that the alleged legal malpractice by H&K caused him to settle his action against his father for an amount less than he would have otherwise obtained in settlement or at trial. "To establish a claim for legal malpractice, a plaintiff must prove the following elements: (1) The existence of an attorney-client relationship which gives rise to a duty of care on the part of the attorney to the client; (2) an act or omission by the attorney in breach of the duty of care; (3) damage to the client; and (4) proximate causation between the attorney's breach of the duty and the damage incurred." *Hizey v. Carpenter*, 119 Wash.2d 251, 260-61, 830 P.2d 646 (1992) (citations omitted).

H&K's motion places at issue only the element of causation.  "Proximate cause consists of two elements: cause in fact and legal causation." *Nielson v. Eisenhower & Carlson*, 100 Wash.App. 584, 591, 999 P.2d 42 (citing *City of Seattle v. Blume*, 134 Wash.2d 243, 251, 947 P.2d 223 (1997), review denied, 141 Wash.2d 1016, 10 P.3d 1071 (2000))."Cause in fact refers to the 'but for' consequences of the act, that is, the immediate connection between an act and an injury." *Blume*, 134 Wash.2d at 251-52, 947 P.2d 223. "The 'but for' test requires a plaintiff to establish that the act complained of probably caused the subsequent disability." *Daugert v. Pappas*, 104 Wash.2d 254, 260, 704 P.2d 600 (1985).  The former client's case must be based on more than just

speculation and conjecture. *Id*.   The second prong, legal causation, "rests on policy considerations determining how far the consequences of a defendant's act *should* extend." *Blume*, 134 Wash.2d at 252, 947 P.2d 223 (emphasis added). "It involves the question of whether liability should attach as a matter of law, even if the proof establishes cause in fact." *Id*. at 252, 947 P.2d 223.

In Washington, the but-for test of the cause-in-fact element of causation is strictly construed.  *Daugert,* 704 P.2d at 604-05 (rejecting a change of the cause in fact but-for test in legal malpractice actions to "loss of opportunity").  The test necessarily requires the former client prove that but for the attorney's negligence, he would have been successful in the prosecution of the original suit.  *See Schmidt v. Coogan*, 162 Wn.2d 488, 173 P.3d 273, 274 (2007)(holding that but for causation requires proof that the former client "probably would have prevailed on the underlying claim.").  In the legal malpractice context, it is said that proximate cause boils down to whether the former client would have (on a more probable than not basis) "fared better" but for the attorney's negligence. *Daugert*, 104 Wash.2d at 257, 704 P.2d 600; *Brust v. Newton*, 70 Wash.App. 286, 293-94, 852 P.2d 1092 (1993).  Thus, to prove causation, the former "client must show that the outcome of the underlying litigation would have been more favorable, but for the attorney's negligence. This proof typically would require a 'trial within a trial[.]' " *Kommavongsa v. Haskell*, 149 Wash.2d 288, 300, 67 P.3d 1068 (2003).   The failure to establish proximate cause mandates the dismissal of a legal malpractice action, regardless of the attorney's negligence.

 The difficult burden the but-for test demands exists to safeguard against speculative and conjectural claims, as the proof requirement serves the essential purpose of ensuring that damages awarded for the attorney's alleged malpractice actually have been caused by the malpractice.  In other words, even if the attorney negligently departed from professional standards-say for instance, by failing to file a claim before the statute of limitations ran-the former client cannot prove damages unless he establishes that he had a meritorious claim. If he would have lost anyway and because he could not prove an

element of his cause of action, the attorney's negligence, however reprehensible, caused him no actual harm.  *See Winskunas v. Birnbaum*, 23 F.3d 1264, 1267 (7th Cir.1994) (holding that a plaintiff cannot recover for legal malpractice if, "even had he been competently represented, he would have lost the suit that his lawyer bobbled").

The courts use an objective standard, rather than a subjective standard, when determining whether a former client would have fared better in the underlying suit. *Brust v. Newton,* 70 Wash. App. 286, 293, 852 P.2d 1092 (Div. 1 1993); *Mattco Forge, Inc. v. Arthur Young & Co.*, 60 Cal.Rptr.2d 780, 793 (Ct.App.1997); 5 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice  § 33.1, at 3-4 (5th ed. 2000).  If a subjective standard were utilized, the arbiter from the first suit would be asked to testify concerning the effect, if any, of the attorney's actions on the outcome of the underlying case.  Based upon Alan's arguments in his motion for recusal and the fact that he named the undersigned as a witness on his witness list (see Ct. Rec. 316), it seems Alan mistakenly believed that a subjective standard was appropriate. However, because of the obvious shortcomings of such a standard making it unworkable, the subjective views of the original presiding judge are irrelevant.  *Hirschberger v. Silverman*, 609 N.E.2d 1301, 1306 (Ohio App.Ct. 1992); *Helmbrecht v. St. Paul Ins. Co*., 362 N.W.2d 118, 125 (Wis.1985).   The objective standard, demands the trier of fact view the underlying suit from the standpoint of what a reasonable judge or jury would have decided but for the attorney's negligence. *Daugert v. Pappas*, 704 P.2d 600, 603 (Wash.1985); *see also e.g., Phillips v. Clancy*, 733 P.2d 300, 303 (Ariz.Ct.App. 1986); *see also e.g.*, *Justice v. Carter*, 972 F.2d 951, 957 (8th Cir. 1992); *Cornett v. Johnson*, 571 N.E.2d 572, 575 (Ind.Ct.App.1991); *Witte v. Desmarais*, 614 A.2d 116, 122, (N.H.1992); *Harline v. Barker*, 912 P.2d 433, 441 (Utah 1996); 4 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice  § 34.11 - § 34.12 (2008 ed.) (describing the standard as "what should have happened").  Thus, the goal here is not to recreate what the presiding judge would have done in the underlying case, but to determine what a reasonable judge would have decided, i.e. what the result should have been had the issue had been properly presented.

Ordinarily, causation and the question of whether the attorney's negligence caused damage in legal malpractice actions is a matter for the jury to decide. *Daugert v. Pappas*, 104 Wn.2d 254, 257, 704 P.2d 600 (1985). However, it is a fundamental proposition in legal malpractice litigation that issues of law in the underlying litigation remain such. Thus, there are occasions when no jury question is presented. Where, as in this case, the issue is whether a party had a meritorious case *as a matter of law*, a question within the exclusive province of a judge in the first instance, the question remains a legal question appropriate for determination by a judge, so long as there are no intertwined issues of material fact. *See e.g., id.* (where the issue of causation hinges on the possible outcome of an appeal, the question of causation is to be resolved by the court as a question of law); *Desilva v. Baker,* 208 Ariz. 597, 96 P.3d 1084 (Ariz.App. Div. 1 2004)(holding that since the issue of absolute immunity was a question of law in the underlying action, it remained a question of law for the court to decide in the malpractice action); *Harline v. Barker,* 912 P.2d 433 (Utah 1996)(proving proximate cause in legal malpractice cases required showing that, absent the attorney's negligence, the underlying suit would have been successful); *Chocktoot v. Smith*, 280 Or. 567, 571 P.2d 1255, 1258 (Or. 1977)(in determining probable consequences of attorney's earlier negligence in later action for malpractice, the line dividing responsibility of judge and jury runs between questions of law and questions of fact).

While a jury would be competent to decide what another fact finding tribunal (either judge or jury) would have done if the Underlying Litigation had gone to trial (*see Brust v. Newton*, 852 P.2d 1092, 1094 (1993)), a jury is not qualified to determine whether a reasonable judge would have found the claims in the underlying action barred as a matter of law by the highly technical areas of law of judicial estoppel and standing. It would be illogical to in effect change the law's allocation of responsibility in deciding a question of law in the underlying action simply because the matter arises in the legal malpractice context.    No jury can reach its own judgment on the proper outcome of an earlier case that hinges on an issue of law. *Id*.

Of course the court can determine proximate cause as a matter of law if "reasonable minds could not differ." *Hertog v. City of Seattle*, 138 Wash.2d 265, 275, 979 P.2d 400 (1999). "[W]hen the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion," then the cause in fact determination may be made as a matter of law. *Petersen v. State*, 100 Wash.2d 421, 436, 671 P.2d 230 (1983) (quoting *Mathers v. Stephens*, 22 Wash.2d 364, 156 P.2d 227 (1945)). In addition, the determination can be made as a matter of law, if on summary judgment the moving party demonstrates an absence of material fact and the party with the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." 477 U.S. at 322-23, 106 S.Ct. at 2552-53.

In this case, H&K has moved for summary judgment attempting to negate the causation element of Alan's malpractice action. H&K contends that the undisputed facts demonstrate that Alan could not have prevailed in the Underlying Litigation because the doctrines of standing and judicial estoppel would have precluded Alan's lawsuit. Thus, it is H&K's contention that Alan can not demonstrate that a rational trier of fact could conclude that Alan suffered some harm as a consequence of the law firm's negligence. In opposing the motion for summary judgment, Alan argues H&K has not met its burden of production to make a prima facie showing that Alan's claims were not viable and that Albert would have been entitled to judgment as a matter of law in the Underlying Litigation. In order to survive summary judgment, Alan need not now show that he was more likely than not to prevail in the Underlying Litigation. *See Rouse v. Dunkley & Bennett, P.A., 520 N.W.2d 406* (Minn. 1994). Rather he must show that there is sufficient evidence to go to the trier of fact - that his claims were legally sufficient and supported by facts, if believed by a trier of fact. *Id*.; 4 Ronald E. Mallen & Jeffrey M.

Smith, Legal Malpractice  § 34.27 (2008 ed.).  In particular, for Alan to succeed here, the record must demonstrate he could have survived a summary judgment in the underlying action on the issues of judicial estoppel and standing.

For the reasons set forth below, the court concludes that H&K has submitted admissible evidence to support a finding that a reasonable judge, more likely than not, would have dismissed Alan's claims in the Underlying Litigation based upon lack of standing and/or judicial estoppel.  That being the case, H&K has met its burden of showing Alan can not prove the causation element of his legal malpractice counterclaim. Absent evidence of causation, Alan cannot prevail on his malpractice counterclaim and summary judgment is appropriate.

**B. Supplemental Filings and Alan DeAtley's Motion to Strike**

Alan has moved to strike H&K's "Supplemental Reply re: Motion for Summary Judgment" (Ct. Rec. 286) filed after the completion of briefing on the Motion for Summary Judgment and which attempts to introduce as evidence herein a transcript of a dictation Alan prepared in 2004 for his first attorneys in the Underlying Litigation regarding, among other things, his pre-bankruptcy activities and interests in Superior Asphalt.  During Alan's depositions in the present case he confirmed that he prepared a tape-recorded dictation for his attorneys and that what he said on the tape was truthful. Ct. Rec. 473 [Affidavit of Sulkin], Ex. A-B.

To verify the accuracy of the transcript produced by H&K, Alan had a court reporter prepare a transcript, a complete copy of which he filed.  Ct. Rec. 482, Ex. C. The two transcripts vary slightly in punctuation marks and occasional words - differences which are immaterial to the substance of the pertinent portions of the transcript. Both transcriptions evidence that in the dictation Alan stated that he was asked by his father to file for bankruptcy and take "all of this bad debt out of the basic structures."  He also states that prior to his bankruptcy "[w]e go in and we move all of my assets" to his father's and Superior's ownership and  "for all of this, this would, once again, assure me that I would get my ownership in the company and that there would be

ORDER - 15

nothing to worry about (was what Albert said)." Ct. Rec. 386, Appendix A at p. 20-21. Alan goes on to state that "when we filed for bankruptcy, all of these agreements were, interestingly enough as far as the attorney was concerned in Albuquerque, not valid, because nothing was taking place on those agreements.  And so as long as nothing was taking place they had no value, so they weren't listed." *Id*. at 21.

Alan argues the transcript produced by H&K should be stricken because it was untimely and is unreliable, irrelevant and inadmissible.  Without citation to any authority, Alan contends the court may not consider this evidence in evaluating causation because this transcript was not in fact brought before the court as evidence in the summary judgment proceedings in the Underlying Litigation and because it was attorney-client privileged, it would not have been admissible evidence in the Underlying Litigation.   Ct. Rec. 422.

The transcript is not substantively irrelevant. Certainly a debtor's attempts to hide assets from a bankruptcy court and creditors and evidence of individual motive are relevant considerations in the judicial estoppel analysis.  This evidence also, however, confirms what are *already* undisputed facts in the record: that prior to filing bankruptcy Alan believed he had an ownership interest in Superior and that prior to filing his bankruptcy schedules he discussed "all those agreements" concerning his interest in Superior with his attorney, who advised him the agreements had no value so they were not listed.  The question of whether the transcript of the dictation is admissible in this proceeding, is a more difficult legal question. Perhaps because, the concept of but-for causation in litigation malpractice is so abstract there are very few authorities explaining the permissible methods of proving (or disproving) the "suit within a suit" requirement - or in this case, the "summary judgment within a summary judgment."   As the goal is to determine what *should* have been the outcome of the underlying case, not what the actual underlying fact-finder would have done, perhaps *any* type of proof on the merit of the underlying claim is admissible.  On the other hand,  if the goal is to re-create the litigation absent the attorney's negligence, then arguably only evidence that would have

been existing and admissible in the underlying case is permissible.

The court concludes that in this instance, the question is whether this evidence should have been admissible in the Underlying Litigation. *See Rangel v. Lapin*, 177 S.W.3d 17, 22-23 (Tex. App.-Houston [1st Dist.] 2005, pet. denied)(suggesting that proof of an underlying claim must be proved by evidence that would have been admissible in the underlying trial). Notably, the court rejects Alan's suggestion that the court can't consider the transcript because it wasn't actually offered in the underlying case. The court hearing the malpractice action is not restricted to considering solely the evidence or defenses actually developed in the underlying case. Indeed, the record of the underlying case is relevant to the question before this court only in that it provides evidence of what transpired in the underlying case. This case is not necessarily fixed by what was or what would have been the procedural status of the underlying case because the objective is to determine what should have been the appropriate result, not what in fact would have been the result. However, because the transcript of the dictation more likely than not would have been protected by the attorney-client privilege in the Underlying Litigation, the court concludes that ultimately H&K's transcript of Alan's dictation should not and will not be considered herein.

The court also does not consider the belated contents of Alan's "Summary Judgment Binder," presented to the court (and opposing counsel) for the first time in court at the conclusion of the June 17, 2008 summary judgment hearing (but filed at the court's request). *See* Ct. Rec. 529. H&K had no opportunity to prepare a response to those materials.

### C. Standing

First, the court considers the threshold issue of whether Alan's contract claims against his father claiming entitlement to an ownership interest in Superior would have been precluded under the doctrine of standing because of Alan's bankruptcy discharge without disclosure of that claim of interest. For the following reasons, the court finds that the undisputed facts demonstrate that there is no material issue of fact as to whether

Alan failed to disclose all assets in his bankruptcy and that his breach of contract claim was part of the bankruptcy estate because it was unseverable from and sufficiently rooted in conduct and agreements made in the pre-bankruptcy past.   Therefore, as a matter of law, a reasonable judge would have decided that Plaintiff lacked standing to bring his breach of contract claim in his own name because Alan's contingent interest in and potential claim for ownership was properly part of the bankruptcy estate.

Under Title 11 of the United States Code (the "Bankruptcy Code"), the filing of a voluntary petition in bankruptcy court commences a bankruptcy proceeding and creates an estate consisting of the debtor's property. 11 U.S.C. § 541(a).  Property interests belonging to a chapter 7 debtor when the petition is filed are part of the estate to be administered by the trustee.  The bankruptcy estate consists of "all legal or equitable interests of the debtor in property, as of the commencement of the [bankruptcy] case." 11 U.S.C. § 541(a)(1).  Subject to exceptions specified in § 541, property a debtor acquires post-petition belongs to the debtor. *See Sender v. Buchanan (In re Hedged-Invs. Assocs., Inc.*), 84 F.3d 1281, 1285 (10th Cir. 1996).

Under the § 541 definition of the bankruptcy estate, "virtually all property of the debtor" becomes property of the bankruptcy estate. *In re Yonikus*, 996 F.2d 866, 869 (7th Cir.1993).  "In fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541." *Id.* (*citing In re Neuton*, 922 F.2d 1379, 1382-83 (9th Cir. 1990).   This includes all claims and causes of action or potential causes of action belonging to the debtor, including contract rights which may be contingent upon future events. *See Whiting Pools*, 462 U.S. at 205 n. 9, 103 S.Ct. 2309*; Sierra Switchboard Co. v. Westinghouse Elec. Corp.*, 789 F.2d 705, 707 (9th Cir. 1986); *In re Ryerson*, 739 F.2d 1423 (9th Cir.1984)*; In re Wick*, 249 B.R. 900, 909 (Bankr.D.Minn. 2000).  Scheduled or not, these all become property of the bankruptcy estate to be administered or abandoned by the bankruptcy trustee. *Kamont v. West*, 258 F.Supp. 2d 495, 498 (S.D.Miss. 2003).

The Bankruptcy Code and Rules furthermore "impose upon bankruptcy debtors an

express, affirmative duty to disclose all assets, including contingent and unliquidated claims." *In re Coastal Plains, Inc.,* 179 F.3d 197, 207-08 (5th Cir. 1999) (citing 11 U.S.C. § 521(1)); see also Fed. R. Bankr.P. 2014.  " 'The debtor need not know all the facts or even the legal basis of the cause of action; rather if the debtor has enough information ... prior to confirmation to suggest that it may have a possible cause of action, then that is a "known" cause of action such that it must be disclosed' ." *Id.* (brackets omitted; *quoting Union Carbide Corp. v. Viskase Corp.*, 183 B.R. 812, 821 n. 17 (Bankr.N.D.Ill. 1995)). The Ninth Circuit has been clear as to the legal consequences of failing to disclose potential claims to the bankruptcy court.  See, e.g., 11 U.S.C. § 521(1); *Cusano v. Klein*, 264 F.3d 936, 947-48 (9th Cir. 2001)(debtor was "under a duty to schedule [open book accounts] as a receivable or as a cause of action for unpaid royalties. His failure to do so vests the claim in the bankruptcy estate, where it remains"). Where a debtor fails to schedule a potential claim with the bankruptcy court, the claim remains the property of the bankruptcy trustee, not the debtor. *See Cusano*, 264 F.3d at 947-48 ("[i]f [debtor] failed properly to schedule an asset, including a cause of action, that asset continues to belong to the bankruptcy estate and did not revert to [debtor]"); *see also Stein v. United Artists Corp.*, 691 F.2d 885 (9th Cir.1982)("[i]t cannot be that a bankrupt, by omitting to schedule and withholding from his trustee all knowledge of certain property, can, after his estate in bankruptcy has been finally closed up, immediately thereafter assert title to the property on the ground that the trustee had never taken any action in respect to it").  An omission by a debtor in his disclosure statement and plan is legally the same as representing that the claim does not exist.  Thus the discharged debtor lacks standing to pursue an unscheduled claim because the bankruptcy trustee, not having knowledge of the claim, took no action with respect to it.

As defined under bankruptcy law, Alan had a pre-petition legal or equitable interest in that he possessed a potential claim for a 50% ownership interest in Superior -- no matter how remote the actual transfer of the interest may have been at the time because of his father's reluctance to sign a written agreement and despite the existence of

ORDER - 19

a contingent promise to document their agreement in writing in the future.   The record and undisputed facts simply do not support the argument that Alan's potential interest in Superior was only some sort of nebulous possibility at the time he filed for bankruptcy. The strict consequence of his failure to disclose the potential interest is losing all right to personally enforce that claim and losing the potential interest to the bankruptcy estate. *Cusano,* 264 F.3d at 947-48 (9th Cir. 2001).

Alan argues his legal claim against his father and equitable interests in obtaining a judgment against his father and Superior are post-petition acquired property because the interest did not accrue until the following post-discharge events occurred: 1) his father signed the written Guaranty Agreement and 2) his father subsequently breached the Guaranty Agreement by failing to transfer his interest in Superior by December 2000. Alan argues his claims therefore never became a part of the bankruptcy estate because he did not possess an enforceable obligation under applicable state law at the time he filed his bankruptcy petition.

Alan's reliance on the date of accrual is inconsistent with the language of the bankruptcy code and bankruptcy law that defines property to expressly include interests that are "unliquidated," "contingent," and "unmatured."   Congress intended this broad definition to require contingent and unmatured interests to be recognized and dealt with in the bankruptcy case.  Though the cause of action may be a creature of state law, property interests subject to disclosure in bankruptcy do not include just present, existing rights, but also potential rights that may or may not ripen into enforceable rights in the future. To the extent Alan's theory limits the definition of property to interests with present enforceability as of the petition date, it improperly excludes contingent and unmatured claims and must be rejected.  *See In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir.1996) (because unmatured and contingent rights to payment are claims, rights to statutory premiums not yet accrued and only assessable at some future time constitute claims); *In re Tomaiolo*, 205 B.R. 10, 15 (Bankr.D.Mass. 1997) ("[A] debtor's property rights in a cause of action are not confined to rights necessary to form a matured

claim."); *see also Field v. Transcon. Ins. Co.*, 219 B.R. 115, 119 n. 9 (E.D.Va. 1998), aff'd, 173 F.3d 424, 1999 WL 102052 (1999) ("Even when a debtor's claim is grounded in prepetition circumstances, his estate can recover for injury occurring postpetition."); *In re Richards*, 249 B.R. 859 (Bkrtcy.E.D.Mich. 2000) (even though legal ability to sue did not accrue until post-petition, where injury occurred pre-petition, claim was "sufficiently rooted" in prepetition past that the claim is property of the bankruptcy estate).

Consistent with the extremely broad definition of property, both a post-petition breach of a pre-petition contract and breach of a post-petition contract stemming from pre-petition conduct have qualified as pre-petition contingent interests subject to acquisition of the bankruptcy estate. *In re Albion Disposal*, 217 B.R. 394, 407-08 (W.D.N.Y. 1997); *In re Weyland*, 63 B.R. 854, 864 (Bankr.E.D.Wis. 1986) (a contract which was awarded post-petition was property of the bankruptcy estate because it was "sufficiently rooted" in the debtor's pre-bankruptcy past and because its inclusion in the bankruptcy estate would not impair the debtor's ability to make an unencumbered fresh start). This is so because, "[i]t is within the fair contemplation of parties entering into a contract that the other party may breach it, or have made representations to induce the making of the contract. Thus, a contingent claim arises at that point, although it may never mature." *In re Russell*, 193 B.R. 568, 571 (Bankr.S.D.Cal. 1996); *accord Chateaugay*, 944 F.2d at 1004 ("the Code's inclusion of 'unmatured' and 'contingent' claims is usually said to refer to obligations that will become due upon the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time the original relationship was created' ").

Alan's post-petition lawsuit can be directly traced almost entirely to pre-petition conduct. This case is distinguishable from cases which involved mere pre-petition preliminary negotiations or mere pre-petition promises. *See e.g.*, *Hoseman v. Weinschneider*, 277 B.R. 894 (N.D.Ill. 2002). The Amended Complaint in the instant case clearly says that prior to filing bankruptcy, Alan and his father had agreed to

transfer and to consummate the transfer of a 50% ownership interest in Superior to Alan. Prior to, during and after his bankruptcy, Alan was working to document their agreement in writing.  It is undisputed that prior to his bankruptcy, Alan felt he was entitled to the ownership interest based upon his pre-petition service to the company.  Indeed, nearly all of the services his father had requested, Alan had performed (or had at least begun performing) prior to the conclusion of the bankruptcy and prior to the time the Guaranty was allegedly signed.  Even the written Guaranty itself stemmed from documents Alan had drafted (along with the assistance of counsel) in the pre-petition past. While the court acknowledges that the conduct giving rise to the breach of contract claim was the alleged breach of the Guaranty allegedly occurring post-petition, the court finds it conceptually impossible to sever his breach of contract claim from the pre-bankruptcy course of conduct and the oral agreements allegedly made with his father.

Alan's version of the facts was that prior to his bankruptcy petition he believed he and his father had an oral agreement to transfer ownership of Superior to Alan in return for his services.  The fact that they had not yet reduced that alleged agreement in writing does not rescue his claim from the bankruptcy estate. The contract had been substantially completed before the bankruptcy.  The facts do not support the idea that Alan's case concerned an entitlement based upon post-petition services he rendered to Superior.  To permit Alan to have had a pre-petition oral agreement for a transfer of ownership of the company and an agreement to document that transfer in writing, then to file his Chapter 7 bankruptcy, then shortly after discharge, consummate that agreement in writing, and finally obtain a ruling that their agreement or his potential cause of action for that ownership interest was not property of the estate, would produce an anomalous result -- especially in the face of the broad disclosure obligations of debtors. *See Matter of Yonikus*, 974 F.2d 901, 904 (7th Cir.1992)("Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate."). It would also foster an unconscionable opportunity to manipulate the Bankruptcy Code.

In *In re Segal v. Rochelle*, 382 U.S. 375, 380, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966), the test applied by the U.S. Supreme Court in determining what constituted property of the estate was whether the nature of the property interest was "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupt's ability to make an unencumbered fresh start." Applying that test to this case, the court is satisfied that Alan had a pre-petition legal or equitable interest, and his breach of contract action against his father and his claim to an ownership interest in Superior - is rooted in the debtor's pre-bankruptcy past.  Alan had a duty to disclose his potential interest in Superior and potential contract claim against his father.  His failure to disclose results in the interests, including the cause of action, becoming part of the bankruptcy estate. Accordingly, based upon a review of the record in the light most favorable to Alan, the court concludes that a reasonable judge could have, and would have, on summary judgment determined as a matter of law that the these contingent, unmatured potential interests were included in the property of the bankruptcy estate and that therefore Alan lacked standing to personally assert the breach of contract claim against his father.

### D.    Judicial Estoppel

H&K maintain that in addition to lack of standing, Alan would have been judicially estopped from asserting the claims against his father because he failed to list his potential claim to a 50% ownership interest in Superior as an asset in his Chapter 7 bankruptcy petition. Judicial estoppel, also sometimes referred to as "equitable estoppel," is an equitable doctrine invoked at a court's discretion. *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).  The doctrine precludes a party from gaining an advantage by taking a position in one action, and then taking an inconsistent position in another action. *Id.; Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 600, 605 (9th Cir. 1996). A debtor who fails to disclose potential claims during a bankruptcy may be judicially estopped from asserting those claims later on. *See Hay v. First Interstate Bank*, 978 F.2d 555, 556 (9th Cir. 1992). Judicial estoppel, however, is inapplicable where a debtor's prior position was

taken because of a good-faith mistake and not as part of a scheme to mislead the court. *Stallings v. Hussmann Corp*., 447 F.3d 1041, 1049 (8th Cir. 2006)(citing *Ryan Operations G.P. v. Santiam-Midwest Lumber Co*., 81 F.3d 355, 362 (3rd Cir. 1996)). In the Ninth Circuit, judicial estoppel applies in a subsequent litigation only if the prior court relied on the inconsistent assertion. *Donato*, 230 B.R. 418, 421 (N.D.Cal. 1999). One court has previously described judicial estoppel as a rule against "playing fast and loose with the courts," "blowing hot and cold as the occasion demands," or "hav[ing] [one's] cake and eat[ing] it too." *Reynolds v. Comm'r*, 861 F.2d 469, 472 (6th Cir. 1988) (citations omitted) (alteration in original).

The Supreme Court has noted that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation or principle." *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Despite the "amorphous nature of judicial estoppel," *Alternative Sys. Concepts, Inc. v. Synopsys*, *Inc.*, 374 F.3d 23, 30-31 (1st Cir. 2004), the Supreme Court identified three considerations that are typically relevant in determining whether judicial estoppel should apply:

(1)    "a party's later position must be clearly inconsistent with its earlier position";

(2)    "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceedings would create the perception that either the first or the second court was misled"; and

(3)     "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*Id*. at 750-51, 121 S.Ct. 1808 (internal quotes and citations omitted); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782-83 (9th Cir. 2001). These factors, however, are not "inflexible prerequisites or an exhaustive formula for determining the applicability of

judicial estoppel." Id. at 751, 121 S.Ct. 1808.

The Ninth Circuit has also held that the inquiry is whether "the debtor ha[d] knowledge of enough facts to know that a potential cause of action exists during the pendency of the bankruptcy, but fails to amend his schedules or disclosure statements to identify the cause of action as a contingent asset." *Hamilton,* 270 F.3d at 784. *See also Hay v. First Interstate Bank of Kalispell, N.A.*, 978 F.2d 555, 557 (9th Cir. 1992) ("We recognize that all facts were not known to Desert Mountain at that time, but enough was known to require notification of the existence of the asset to the bankruptcy court."). The Washington State Court of Appeals found that "[p]ossible causes of action should be listed, even if the likelihood of success is unknown." *Cunningham v. Reliable Concrete Pumping*, 126 Wn.App. 222, 230 (2005). The court then held that the plaintiff's failure to disclose a potential L & I claim during his bankruptcy proceedings fulfilled the first criterion of judicial estoppel. *Id.*

In addition to these factors, the Ninth Circuit examines whether the party to be estopped acted inadvertently or with any degree of intent. *Johnson v. Oregon Dep't of Human Resources Rehab. Div.*, 141 F.3d 1361, 1369 (9th Cir. 1998)); *see also Prach v. Bowen Property Mgmt.*, CV 03-250 EFS, 2007 WL 397453, *4 (E.D.Wash. Feb.1, 2007) ("Although Defendants cite authority that litigants should be bound by the actions of their attorneys, the inquiry is not whether Plaintiff Kriger is 'bound' by the mistakes in the original schedules, but rather whether the Plaintiff Kriger (along with his counsel) acted intentionally, as opposed to inadvertently"). "Judicial estoppel applies when a party's position is 'tantamount to a knowing misrepresentation to or even fraud on the court.' " *Johnson*, 141 F.3d at 1369 (*quoting Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362-63 (3d Cir. 1996)). Thus, "[i]f incompatible positions are based not on chicanery, but only on inadvertence or mistake, judicial estoppel does not apply." *Id.* (*citing In re Corey*, 892 F.2d 829, 836 (9th Cir. 1989)); *see also Wyler Summit Partnership v. Turner Broadcasting Sys., Inc.* ., 235 F.3d 1184, 1190 (9th Cir. 2000) ("The doctrine of judicial estoppel requires, inter alia, a knowing antecedent

ORDER - 25

misrepresentation by the person or party alleged to be estopped and prevents the party from tendering a contradictory assertion to a court," *citing Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)). "Thus, if a claimant's particular representations are so inconsistent that they amount to an affront to the court, judicial estoppel may apply." *Johnson*, 141 F.3d at 1369.

A party may invoke the doctrine of judicial estoppel in a motion for summary judgment to bar a claim based on an inconsistent position.  The non-moving party seeking to defeat summary judgment on judicial estoppel grounds must "sufficiently explain" a prior judicial position that is inconsistent with an essential element of its claim. *See, e.g., Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (stating that a party must "provide a sufficient explanation" for a prior inconsistent position to defeat summary judgment); *Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629, 634 (9th Cir. 2007) (concluding that the evidence plaintiff presented distinguishing its position from the position it took in prior litigation "fail[ed] to rebut the determination of clear inconsistency" and thus "[t]he application of judicial estoppel ... was not an abuse of discretion").

It is undisputed that at the time Alan filed his bankruptcy petition, he *believed* he had an agreement with his father for an ownership interest in Superior.  In his Amended Complaint in the Underlying Litigation he stated that "over the course of his life, Alan has entered into various enforceable contracts pursuant to which Albert agreed to convey 50% interest in Superior and its respective subsidiary affiliated companies...As a result of Albert's commitments...Alan dedicated most of his working life to SA&C and Superior." It is undisputed Alan had knowledge of his potential claim for 50% ownership interest in Superior at the time of his bankruptcy petition, and that he worked throughout the 1980s and into the 1990s hiring lawyers to solidify his entitlement in writing and to effectuate the transfer of his interest.   Alan's discussion of his agreements and this potential interest with his bankruptcy attorney is additional evidence of his knowledge. Despite this awareness, the undisputed facts show that Alan made a deliberate decision

not to list any interest or claim relating to Superior on his bankruptcy petition and schedules, because in his view, he did not currently possess an ownership interest in Superior and therefore had no asset to disclose.  This evidences intentional conduct and is consistent with a motive to conceal.

Alan was required under *Hamilton,* 270 F.3d at 784,  and *Hay*, 978 F.2d at 557 to list his claims and potential claims in his bankruptcy proceeding because he had enough *knowledge* of his claim to an ownership interest in Superior.  That he perhaps had no viable or enforceable cause of action at the time of his bankruptcy is irrelevant.  His failure to list his potential interest in Superior is the same as an admission that the interest did not exist.  The bankruptcy court relied on Alan's non-disclosure when it granted him a discharge.  Alan's positions in the litigation against his father amounted to the assertion of inconsistent positions within the meaning of judicial estoppel. Alan would derive an unfair advantage if he would have been allowed a discharge of his million dollar debts (including those to Superior) and then individually successfully pursue a judgment against his father based on his undisclosed interest in Superior.

Full and truthful disclosures in every court or proceeding are important and arguably, there is an even heightened need in a bankruptcy proceeding.  The doctrine of judicial estoppel is intended to protect the orderly administration of justice and the integrity of all judicial proceedings.  However, this court realizes that any reasonable judge would only exercise the "strong medicine" of judicial estoppel with great circumspection and would not treat merely careless or inadvertent nondisclosures as equivalent to deliberate manipulation.[1]  In this instance the debtor can not eliminate the motive to conceal.  Allowing Alan to keep for himself the benefit of any potential

---

[1]  Notably, one other court has applied judicial estoppel to foreclose a claim filed by DeAtley based upon that court's conclusion that the DeAtleys had inconsistently received bankruptcy relief and thereafter sought contradictory relief.  *DeAtley v. Barnett*, 127 Wash.App. 478, 483, 112 P.3d 540 (2005), review denied, 156 Wash.2d 1021, 132 P.3d 735 (2006), cert. denied, --- U.S. ----, 127 S.Ct. 123, 166 L.Ed.2d 35 (2006).

interest  or recovery on his claim for ownership in Superior, when he successfully shielded his creditors from that asset through his bankruptcy plan, would give him an unfair advantage.

Moreover, his explanations for his failure to disclose are unavailing. First, the court notes that Alan has not expressly claimed ignorance of the bankruptcy disclosure requirements, though his statement that he did not disclose any interest in Superior because he did not currently own any share of Superior suggests ignorance of the rules. Alan argues that he discussed his (potential) ownership interest in Superior with his bankruptcy attorney and relied upon her advice in not listing the potential asset or claim. In a similar case, the Eleventh Circuit noted that although the "[debtor's] attorney failed to list [the debtor's] discrimination suit on the schedule of assets despite the fact that [the debtor] specifically told him about the suit, the attorney's omission is no panacea." *Barger v. City of Cartersville, Georgia*, 348 F.3d 1289, 1295 (11th Cir. 2003). The *Barger* court relied upon *Link v. Wabash R.R. Co.*, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) for the general proposition that a litigant is bound by the errors of his or her attorney. *See Link*, 370 U.S. at 633-34, 82 S.Ct. 1386 ("Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent.").  The Fifth Circuit has also held that inadvertence resulting from ignorance of bankruptcy disclosure requirements and consequent reliance on one's bankruptcy attorney for guidance and advice, "is not the type that precludes judicial estoppel against plaintiff ... from asserting in the instant litigation the previously nondisclosed claim."  *In re Coastal Plains, Inc.*, 179 F.3d 197, 205, 212 (5th Cir. 1999).  The court finds the conclusion reached by these courts would have been appropriate in Alan's underlying case as well.

Alan had knowledge of the factual basis for his ownership claim and cause of action, the motive for concealment existed, and he in fact did conceal it by failing to fully inform the bankruptcy trustee, thus the only conclusion is that the omission was intentional.  Where Alan has been shown to have been less than sufficiently forthcoming,

the doctrine of judicial estoppel is available. The court accordingly concludes H&K has met its burden of production of showing the elements of judicial estoppel were met and that there is insufficient evidence of record to suggest Alan could have survived a summary judgment motion in the underlying action.

**V.    CONCLUSION**

H&K has met its prima facie burden of showing that Alan's breach of contract claims would not have been viable against his father because he lacked standing to assert the claim and because his attempt would have been judicially estopped.  Moreover, Alan has not demonstrated there would have been sufficient evidence to avoid summary judgment in the underlying action.  There is no escape from the conclusion herein that Alan is unable to establish the essential element of his malpractice claim which requires he prove on a more probable than not basis that but for his attorneys' negligence, he would have fared better in the underlying action.  Accordingly, Alan's legal malpractice counterclaim is dismissed in its entirety.

Plaintiffs' Motion for Summary Judgment on Defendant's Counterclaim of Legal Malpractice on Grounds of Standing and Estoppel **(Ct. Rec. 243)** is **GRANTED**. The court's prior order denying Defendant DeAtley's Motion to Strike (Ct. Rec. 387) at Ct. Rec. 395, is AMENDED to the extent the court herein partially grants the motion, excluding from consideration the transcription attached to H&K's Supplemental Reply. DeAtley's request for fees and costs associated with having filed the Motion to Strike is denied.

**IT IS SO ORDERED.**

The Clerk is hereby directed to enter this Order and furnish copies to counsel.

**DATED** this  29th day of August, 2008.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE